# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

WILLIAM M. PEARCE                      )
         Plaintiff,                )
                        )
v.                                     )        Case No.: 22-cv-02635-LKG
                        )
FRONTIER AIRLINES, INC.                )
         Defendant.               )
_____)

## AFFIDAVIT OF BRADLEY J. LAMBERT

I, Bradley Lambert, being duly sworn, state as follows:

1.     I am the Vice President of Flight Operations for Frontier Airlines ("Frontier").  I have held this position since August of 2017.  I am over the age of majority (59) and am competent to testify.  The matters described in this affidavit are within my personal knowledge.

2.     Frontier is a passenger air carrier regulated under Part 121 of the Federal Aviation Regulations.  Frontier operates scheduled service to approximately 120 destinations and flies a fleet of 127 Airbus aircraft.  Frontier is headquartered in Denver, Colorado.

3.     Earlier in my aviation career, I was employed by an air carrier named USA 3000, and I met William (Bill) Pearce during our time with USA 3000.

4.     Bill Pearce contacted me in February 2021 and expressed an interest in applying for a pilot position at Frontier.  I encouraged him to pursue it.  Pilot applicants at Frontier follow our hiring protocols which involve completing and updating an application and then proceeding through the pilot selection process.

5.     This process includes an initial vetting of applicants by Frontier's Senior Manager of Talent Acquisition to determine whether the candidate should proceed to the formal interview

process conducted by Frontier's pilot candidate review committee.  At the time, Gerardo Arellano held that initial vetting or screening role.

6.      After he conducted a screening of Mr. Pearce and his application, Mr. Arellano reported to me that he did not believe that Mr. Pearce was a good fit for Frontier.  He was uncomfortable with Mr. Pearce's application.  He pointed out that he seemed to be just looking for a job, that he did not take accountability for a training failure while at Republic Airlines, and that his flight hours were very high, but he had not upgraded to a Captain position.

7.      I could have overridden Mr. Arellano's recommendation but, based on Mr. Arellano's reasoning and explanation over why Mr. Pearce was not among the best pilot candidates, I accepted his recommendation and respected his judgment.  I agreed with Mr. Arellano that Mr. Pearce's remaining only in a first officer role with his level of flight hours and tenure at Republic Airlines (his current employer) – along with his not taking accountability for a training irregularity – made him a less suitable pilot candidate.

8.      Mr. Pearce's age played no role in my accepting Mr. Arellano's recommendation not to advance Mr. Pearce to the interview stage, nor do I have any reason to believe that his age played any role with Mr. Arellano in making his recommendations.  Mr. Pearce's age is not contained anywhere in his application.

9.      During the 2019-2021 time period when Mr. Pearce applied to become a Frontier pilot, Frontier not only advanced numerous pilot candidates over the age of 50 to the interview stage, but hired numerous candidates to become Frontier pilots.  This included nearly 75 new hire pilots aged between 50 and 59.

I, Bradley Lambert, swear that the foregoing is true and correct to the best of my personal

knowledge and belief.

Bradley J. Lambert

Subscribed and sworn to before me on this

21st day of August , 2023.

Notary signature

[SEAL]

Shannon M. Muir
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20144033345
MY COMMISSION EXPIRES AUGUST 26, 2026

3

# EXHIBIT B

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3        - - - - - - - - - - - - - -x

4        WILLIAM M. PEARCE,              :

5                 Plaintiff,             :

6        v.                             :  CASE NO.

7        FRONTIER AIRLINES, INC.,   :  22cv02635-LKG

8                 Defendant.           :

9        - - - - - - - - - - - - - -x

10

11              DEPOSITION OF WILLIAM M. PEARCE

12                 Thursday, June 8, 2023

13                      10:34 a.m.

14

15

16

17        Job No.:  43618

18        Pages 1 through 110

19        Reported by:  Cassandra E. Ellis, RPR, RMR, CRR,

20        Realtime Systems Administrator #823848;

21        CSR-HI #475, CSR-CA #14448, CCR-WA #3484

22

Page 11

1          Q.   Okay.   At Republic and beyond?

2          A.   Yes.

3          Q.   Okay.   Now, currently you are a

4     pilot for Republic Airlines?

5          A.   Correct.

6          Q.   We can get into the discussions

7     with others, maybe a little bit later on, but

8     have you -- have you posted anything on the

9     internet or social media sites regarding your

10    claim?

11         A.   Not to my recollection, no.

12         Q.   Do you typically post on social

13    media?  I know I don't, so --

14         A.   I -- yes, I do, but I don't air my

15    dirty laundry on social media.

16         Q.   So you haven't said anything about

17    this matter on social media?

18         A.   Not to my recollection, no.

19         Q.   Okay.   Or about Frontier Airlines?

20         A.   No, not to my recollection.

21         Q.   Okay.   And in getting ready for

22    today, for this deposition, aside from road

Page 13

```
1        documents, did you review anything in
2        preparation for today?
3               A.   Oh, I don't think so, no.
4               Q.   Now, let's talk about -- I asked
5        you before if you've ever testified in a
6        deposition, previously, and you indicated that
7        this was your first time?
8               A.   Correct.
9               Q.   Have you ever testified before in
10       any other legal proceedings?
11              A.   No.
12              Q.   What about system board
13       proceedings?
14              A.   No.
15              Q.   Like union grievances?
16              A.   No.
17              Q.   Okay.  Let's go over your
18       background a little bit.
19              A.   Okay.
20              Q.   Because this is a case involving
21       age, I normally don't ask this question, but
22       what is your age?
```

Page 14

```
 1              A.    60.
 2              Q.    Okay.  And -- and where is your
 3       residence?
 4              A.    Northern Baltimore County, State of
 5       Maryland, town of Monkton, M-o-n-k-t-o-n.
 6              Q.    Okay.  How long have you been
 7       living in that area?
 8              A.    60 years.
 9              Q.    So you grew up in that area?
10              A.    Yes.
11              Q.    Would it be fair to say that you
12       have ties to the community?
13              A.    250 years' worth.
14              Q.    So multi-generations in your family
15       have lived there?
16              A.    Seven or eight, maybe nine, yes.
17              Q.    And I under -- well, do you do any
18       volunteer work in your community?
19              A.    Extensively.
20              Q.    Can -- can you just summarize what
21       that is?  We don't have to get into painstaking
22       detail.
```

1      Exhibit 1.  Sorry.  This is one for you to keep.

2                    THE WITNESS:  Oh, all righty.

3                    (Exhibit No. 1 was marked for

4      identification.)

5                    THE WITNESS:  All right.  Here's

6      something I don't think belongs to me.  Thank

7      you.

8    BY MR. PETESCH:

9            Q.  And my only question, right now, is

10     if you recognize this document.

11           A.  It would appear to be my Frontier

12     application, is that correct?

13           Q.  That's my belief, so...

14           A.  Okay.

15           Q.  Does it look familiar to you?

16           A.  Yes.

17           Q.  Okay.  So -- and taking a look

18     through it, does this look to be the information

19     that you provided to Frontier Airlines?

20           A.  At a brief glance, yes.

21           Q.  And we'll go through stuff in more

22     detail later on.

Page 19

```
 1              A.   Okay.
 2              Q.   But if it helps you, I wanted to
 3       trace your experience in aviation --
 4              A.   Okay.
 5              Q.   -- from a 30,000-foot level --
 6              A.   Okay.
 7              Q.   -- for the moment, where you got
 8       started --
 9              A.   Okay.
10              Q.   -- and then bring us up to today.
11              So where did you get started?
12              A.   Embry-Riddle Aeronautical
13       University, Daytona Beach, Florida.
14              Q.   Okay.  And did you obtain your
15       commercial pilot's license after completing your
16       work at Embry-Riddle?  Maybe I should ask:  Did
17       you complete the course at Embry-Riddle?
18              A.   I did not complete the four-year
19       degree, no.
20              Q.   And then how did you come to become
21       a commercial pilot?
22              A.   Through going through all the
```

1      required FAA licensing and rating requirements

2      through various FAA-approved part 141 schools.

3             Q.   And when did -- when did you obtain

4      your commercial pilot's license?

5             A.   I'd have to go back and look at the

6      specific date, because there's private,

7      instrument, commercial single engine, commercial

8      multiengine, commercial instrument multiengine,

9      ATP, it's -- it's quite an arduous journey.

10            Q.   Okay.  What license do you -- what

11     is the -- might not be a very precise question,

12     but what is the license -- the pilot's license

13     that you currently hold?

14            A.   Unrestricted -- unrestricted

15     airline transport pilot certificate.

16            Q.   And when did you obtain that?

17            A.   Again --

18            Q.   Again, more or less, I mean --

19            A.   I can't give you an honest guess.

20     I would say maybe early '90s, perhaps.

21            Q.   Okay.

22            A.   I would say I would have to go back

Page 21

1       and look.

2               Q.   So it would be fair to say more

3       than 20 years ago?

4               A.   Yeah.

5               Q.   Okay.  And you -- and if you could,

6       could you identify the part 121 carriers that

7       you've flown for?

8               A.   US Airways.

9               Q.   Okay.

10              A.   USA3000 Airlines.

11              Q.   Mm-hmm.

12              A.   I still don't understand where they

13      got that name from.

14                   Republic Airways.

15                   That's it.

16              Q.   CC Air?

17              A.   They were part 135.

18              Q.   135?  Okay.

19              A.   At the time I was with them, I

20      don't know if they ever changed their

21      certificate.

22              Q.   Let's start with CC Air --

Page 22

1          A.   All right.

2          Q.   -- for a moment.

3               Approximately when -- and you can

4     look at your application if you want, I'm not

5     trying to stump you on dates -- but

6     approximately when did you fly for CC Air?

7          A.   1990 -- 1995 to 1999.

8          Q.   Okay.  And what kind of equipment

9     did you fly?

10          A.   British Air Space Jet Stream 31-32

11     and De Havilland-8.

12          Q.   Dash 8?  Okay.

13               And -- and were you -- well, I take

14     it you started out as a first officer --

15          A.   Correct.

16          Q.   -- at CC Air?

17          A.   (Nodding.)

18          Q.   Did you ever upgrade during your

19     time at CC Air --

20          A.   Yes.

21          Q.   -- into the left seat?

22          A.   Yes.

1           When did you finish flying for

2    USA3000?

3           A.   When they -- well, approximately, I

4    think, four to six months prior to them

5    surrendering their operating certificate back to

6    the FAA.  Everything's done on seniority, so

7    they shrunk the airline and finally my number

8    came up.

9           Q.   Okay.  And you were flying in the

10    first officer seat when your number came up?

11           A.   Correct.

12           Q.   So at USA3000 do you, just due to

13    numbers or whatever, you did not upgrade to

14    captain?

15           A.   Correct.

16           Q.   Did you attempt to upgrade to

17    captain at USA3000 as soon as your seniority

18    permitted?

19           A.   No.

20           Q.   So you waited for a little while?

21           A.   Yes.

22           Q.   And what was the -- what was the

Page 28

1       reasoning for that?

2                   A.   Quality of life.

3                   Q.   Where were you based at USA3000?

4                   A.   I had several bases, Baltimore,

5       Philadelphia, and in the closing months,

6       Chicago.

7                   Q.   ORD or Midway.

8                   A.   ORD.

9                   Q.   ORD.  Okay.  Okay.

10                  For the time that you were at

11      USA3000, was the only equipment that you flew

12      the A320?

13                  A.   Yes.

14                  Q.   And is that the only equipment that

15      USA3000 flew?

16                  A.   Yes.

17                  Q.   Over your history of commercial

18      piloting, have you ever had any training

19      failures?

20                  A.   Ask the question again.

21                  Q.   Sure.  Have you ever experienced

22      any training failures at any of the commercial

Page 29

```
 1        carriers you've worked for?

 2               A.   I had an incomplete evaluation at

 3        Republic Airways.

 4               Q.   Okay.  And approximately when was

 5        that?

 6               A.   2018, I believe.

 7               Q.   Okay.  And -- and -- and that's

 8        something that you reported on your application

 9        to Frontier in Exhibit 1?

10               A.   Pretty sure I did, yes.

11               Q.   Yeah.  I think it's going to be the

12        second to the last page.

13               A.   I think the last page.  Oh, there

14        we go.

15               Q.   Yeah.  So you're right on the year,

16        2018.

17               A.   Maneuvers validation June 2018, my

18        SIM partner had an incredibly strong --

19               Q.   Going too fast.

20               A.   Would you like me to read that

21        or -- for --

22               Q.   I -- I just want you to address
```

Page 30

1          what occurred.

2                    A.    Well, as --

3                    Q.    And you can either read it or --

4          that's fine.

5                    A.    As stated in the application, my

6          yearly maneuvers validation, June 2018, my SIM

7          partner had an incredibly strong Eastern

8          European accent.  I just could not understand

9          him.  This, in turn, disrupted the flow of the

10         maneuvers and we ran out of time.  I was paired

11         with another SIM partner and completed the

12         validation without any problem.

13                   Q.    Okay.  And is -- is this the sort

14         of item that gets reported in Pilot Records Act

15         Record?

16                   A.    I can't answer that, I'm not

17         familiar with PRAR.

18                   Q.    Okay.  Did you -- did you ever

19         review your pilot records under PRAR when

20         applying to Frontier, for example?

21                   A.    No.

22                   Q.    Okay.  And -- and did you -- did

Page 31

1    you -- this -- this is for your annual recurrent

2    training?

3         A.    Mm-hmm.

4         Q.    And did you --

5         A.    Excuse me, yes.

6         Q.    And did you -- did you pass on the

7    next time around with that, with a different

8    partner?

9         A.    Without any problem, yes.

10        Q.    How long had you been flying --

11   well, when did you start flying for Republic?

12        A.    2016.

13        Q.    Okay.  And as with all carriers you

14   would have started in the first officer seat?

15        A.    Correct.

16        Q.    Are you still in the first

17   officer's seat?

18        A.    I am.

19        Q.    And when -- well, has your

20   seniority at Republic enabled you to upgrade to

21   the left seat?

22        A.    Yes.

Page 33

1              Q.    I'm sorry.

2              A.    So that just opened that whole can

3       of worms and I withdrew from the class.  I went

4       to my instructors and said, my head's not in it,

5       and they said, we totally understand.  So I

6       withdrew.  Yeah, I withdraw.

7              Q.    Okay.  And approximately when was

8       it that you were in the upgrade class, well,

9       what year?

10             A.    2019 or perhaps 2020, I'm not sure.

11             Q.    Okay.  Are you considering, at this

12      point, upgrading at Republic?

13             A.    It's a quality of life question.

14      Having lost three family members in car wrecks

15      it totally brought home how precious life is, so

16      if I'm able to hold a decent domicile at a

17      decent seniority, yes.

18             Q.    If -- if you upgraded now, to

19      captain, would you be able to keep your domicile

20      at DCA?

21             A.    I believe so.  Again, I have to

22      look at the numbers.

1    have been had you --

2                A.    No.

3                Q.    Any awareness, sitting here, of how

4    many others were applying around the same time

5    as you?

6                A.    Nobody has those numbers, except

7    individual companies.

8                Q.    Were there any other applicants to

9    Frontier around the time you applied, from

10   Republic, who you knew?

11               A.    Not that I'm aware of, but it's not

12   something pilots advertise.

13               Q.    Let's -- let's go through the

14   application process, just a little bit.

15               A.    Okay.

16               Q.    What did you do to apply?

17               A.    I don't believe I understand the

18   question.

19               Q.    Sure.  It wasn't very artfully

20   phrased.

21                     Walk me through the process of how

22   it got started for you.

Page 43

1           A.   Like every other airline, you go

2      online and fill out an application.

3           Q.   Okay.  And that's what you did, as

4      well?

5           A.   Yes.

6           Q.   Did you -- did you do anything else

7      to try to further your application?

8           A.   Reached out to former coworker Brad

9      Lambert.

10          Q.   Okay.  And Brad Lambert is the vice

11     president of flight ops at Frontier?

12          A.   I believe that's his title.  Some

13     people call it director of flight ops, some

14     people call it director of operations.  I'm not

15     sure what's printed on his business card.

16          Q.   But your understanding, at the

17     time, was that he was a management pilot at

18     Frontier?

19          A.   Yes.

20          Q.   Okay.  And how did you come to know

21     Brad Lambert?

22          A.   Working with him at USA3000

Page 58

1          A.   Again, background, resum? items, I

2     believe there was some community volunteer

3     questions.

4          Q.   As reflected on your application?

5          A.   Yes.

6          Q.   Did he ask you about your flight

7     hours, any questions about your flight hours?

8          A.   Ask the question a different way,

9     please.

10          Q.   Sure.  Did you cover, in your

11     conversation, your flight hours?

12          A.   Yes.

13          Q.   What do you recall discussing about

14     your flight hours in that conversation?

15          A.   Specifically, he told me on three

16     separate occasions that my resum? is great,

17     you're the type of candidate we want.  However,

18     you have over 13 or 14,000 hours, at the time.

19     And I said, yes, I bring a lot of experience to

20     the table.

21              And he goes, well, here's the rub,

22     the pilot review hiring committee will not hire

Page 59

1     anybody over 7,000 to 7,500 hours, at which I

2     silently choked.

3              Q.   Did he say anything else about

4     that?

5              A.   Yes.

6              Q.   What did he say?

7              A.   In my response to:  Why is that?

8     He responded back that the pilot review hiring

9     committee feels that people with your experience

10    and time in the aircraft are considered

11    untrainable and too set in your ways.  I choked

12    again, silently, in disbelief.

13             Q.   Did you --

14             MR. PETESCH:  Let's go off record a

15    second.

16             THE VIDEOGRAPHER:  The time is

17    11:38 a.m.

18             We are off the record.

19             (Recess.)

20             THE VIDEOGRAPHER:  The time is now

21    11:48.

22             We are back on the record.

Page 62

```
 1                A.   And again, thunderstruck, and I
 2      would circle back again.  I circled two
 3      additional times to hear the statements said
 4      basically the same way three times.
 5                Q.   And did Mr. Arellano identify who
 6      was on the pilot review -- pilot hiring
 7      committee?
 8                A.   No.  I wouldn't have expected him
 9      to.
10                Q.   In -- in the conversation with
11      Mr. Arellano, did he ask you your age?
12                A.   No.
13                Q.   Did you volunteer your age?
14                A.   No.
15                Q.   Did he ever say, in the
16      conversation, that your age was a concern?
17                A.    Indirectly.
18                Q.   What do you mean by indirect?
19      Explain what you mean by indirectly.
20                A.    In this industry, 15 -- 14 --
21      13,000 hours and above is a considerable amount
22      of time.  And if you've been in -- if you have
```

Page 72

```
 1      was one about the three feet of snow, which I

 2      think we saw --

 3              A.   Yeah.

 4              Q.   -- in some of the others?

 5              A.   There was the one about:  Hope to

 6      see you on the property soon or looking forward

 7      to seeing you.  Check your voicemail, wink-wink,

 8      nod-nod.

 9              Q.   Mm-hmm.

10              A.   You know, all very positive,

11      encouraging, affirmative statements that he

12      wanted to see me as an employee at Frontier.

13      And certainly between the initial conversations

14      here, around February 16th, until we get into

15      the end of March, he -- and the committee, or

16      not the committee, but HR folks, had a chance to

17      review Exhibit 1.

18              Q.   Your application?

19              A.   Yes.  And he was still very

20      encouraging.  So there weren't any red flags

21      expressed at the time.  He was very positive

22      about the exchange and insinuated that:  Look
```

Page 75

1      of days later?

2              A.   Oh, very much so, yes.

3              Q.   Did you report to Brad, to the best

4      of your recollection -- strike that.

5                   You -- you had a further exchange

6      with Brad, and this is on the first page of

7      Exhibit 5, getting specific on what Jerry

8      Arellano told you in your conversation, and you

9      have:  His words were that some believe on the

10     review committee that with flight times like

11     mine that it was felt that we are untrainable

12     and too set in our ways; do you see that?

13             A.   Yes.  And that's a reiteration of

14     what I sent to him an hour before.

15             Q.   And in -- to the best of your

16     recollection, was that as close to a direct

17     quote as you recall?

18             A.   Yes.  I say it very clearly in two

19     different e-mail conversations.

20             Q.   Did -- did -- did Mr. Arellano ever

21     use the term age in your conversation?

22             A.   I believe in one of the circling

Page 76

1          backs he -- I believe he might have, yes.

2                    Q.    Okay.  You can't say definitively

3          whether he --

4                    A.    No.

5                    Q.    -- said age?

6                    A.    But it was -- the intent is very

7          clear.

8                    Q.    Well, you inferred, based on flight

9          hours, that he meant years of experience --

10                   A.    Jerry's statements was --

11                   Q.    That he meant years of experience

12         and/or age?

13                   A.    Yes.  And that derived from the

14         number of flight hours.  His words were, well,

15         I'm looking at your flight time.  Here's the

16         rub, or something to that effect.  And that's

17         when he proceeded to continue about the pilot

18         review hiring committee.

19                   Q.    Okay.  Okay.  So going back to your

20         e-mail exchange with Brad, after that?

21                   A.    Okay.

22                   Q.    In Exhibit 5?

Page 79

1     during any of the conversations or did you just

2     call him afterwards and say --

3          A.   I called him less than a minute

4     after I hung up with Jerry, saying:  You're not

5     going to believe this, and he was as

6     thunderstruck as I was.

7          Q.   What did you tell James about the

8     conversation?

9          A.   I told him everything, verbatim,

10    even went onto comment, as I have here today,

11    isn't this the -- what they teach you in HR101,

12    you don't say or imply, you know, these

13    different things.

14         Q.   And -- and your view is that the

15    implication of bringing up flight hours is that

16    he meant -- or that -- or he meant that -- let

17    me strike that.

18              It was your inference that in

19    referring to flights hours he was referring to

20    age?

21         A.   Yes, absolutely, as was James, and

22    as was anybody that I've spoken to about this in

Frontier Airlines, Inc. is an equal opportunity employer and, as such, is committed to providing equal employment opportunities to all qualified applicants without regard to race, color, religion, sex, national origin, age, marital status, veteran status, sexual orientation, gender identity or expression, disability status, pregnancy, genetic information, citizenship status or any other basis protected by federal, state, or local laws. This policy applies to all terms and conditions of employment, including: recruiting, hiring, placement, promotion, termination, layoff, recall, transfer, leaves of absence, compensation and training.

## PERSONAL INFORMATION

| First Name: | william | | Last Name: | pearce |
|---|---|---|---|---|

| Street Address: | 2334 Shepperd rd. / pob 576 |
|---|---|

| City: | monkton | State: | MD | Zip: | 21111 | Country: | USA |
|---|---|---|---|---|---|---|---|

| Passport Number: | ███████ | Issued Date: | ██████ | Expired Date: | ██████ |
|---|---|---|---|---|---|

| Country of Issuance: | usa | | Country of Legal Residence: | usa |
|---|---|---|---|---|

| Aliases: | |
|---|---|

| Last Date Updated: | 5/24/2021 3:26:12 PM |
|---|---|

| Home Phone: | 410-472-4415 | Email Address: | fly21111@comcast.net |
|---|---|---|---|

| Cell Phone: | 410-627-5200 | Fax Number: | |
|---|---|---|---|

| Business Phone: | |
|---|---|

| Date of Availability: | 2 weeks notice |
|---|---|

### ADDRESS HISTORY

| From | To | Address | City | State | Zip |
|---|---|---|---|---|---|
| 6/1/1991 | Present | 2334 Shepperd rd. / pob 576 | monkton | MD | 21111 |

### EDUCATION HISTORY

| Years of College: | 2 | Degree: | Associate | Fluent in English: | Yes | Other Languages: | english |
|---|---|---|---|---|---|---|---|

| Professional Development: | From: | 9/16/2013 | To: | 9/27/2013 |
|---|---|---|---|---|
| | School: | National Transportation Safety Board | | |
| | Address: | 45065 Riverside Parkway | | |
| | City: | Ashburn | State: | VA |
| | Program: | Aircraft Accident Investigation , 2 week course | | |
| | Graduate: | Yes | GPA: | 4.00 |

| University - U.S. Accredited: | From: | 5/1/1984 | To: | 9/1/1985 |
|---|---|---|---|---|
| | School: | Embry-Riddle Aeronautical University - Daytona Beach | | |
| | Address: | 600 S Clyde Morris Blvd | | |
| | City: | Daytona Beach | State: | FL |
| | Program: | aero science | | |

# CONFIDENTIAL



| Graduate: | No | | GPA: | |
|---|---|---|---|---|

| Educational Achievements: |
|---|
| |

## DRIVERS RECORD

| License: | ■■■■■ | State: | MD | Class: | C | Expires: | ■■■■■ |
|---|---|---|---|---|---|---|---|

List ALL driving violations, including DUI, speeding, suspension or revocation. List each offense, City/State and Dates:

*No Driving History Recorded*

## CRIMINAL RECORD

| Violated TSR (Transport Safety Regulations): | No |
|---|---|

| TSR Comments: |
|---|
| |

| In the past ten (10) years, have you ever been convicted of a crime involving a felony, misdemeanor, infraction, or violation of any law? Please exclude all traffic violations. | No |
|---|---|

| If yes, explain all details (Non-Traffic violations only). |
|---|
| |

| Driving While Impaired: | No | Under the Influence: | No | Driving While Intoxicated: | No |
|---|---|---|---|---|---|
| License Suspended: | No | License Revoked: | No | | |

| Additional Details: |
|---|
| |

## EMPLOYMENT & BACKGROUND INFORMATION

Federal Regulations require that a background check be conducted on all persons prior to their being cleared for unescorted access to airport secure areas. The background check requires verification of representations made by the applicant relating to employment and other activities during the preceding 10 years. To meet this requirement, **PLEASE PROVIDE INFORMATION COVERING ALL PERIODS OF EMPLOYMENT, UNEMPLOYMENT, SCHOOLING, OR OTHER ACTIVITIES FOR THE PAST 10 YEARS.** You must provide us with the means of verifying your status for the full 10-year period. This check must be completed before you can be issued identification authorizing unescorted access to airport security areas

FAA requires that a minimum of ten (10) year employment history be done on all new employees. You must be able to thoroughly furnish below the names of businesses, persons, references and their telephone numbers who may be contacted to confirm your employment, self-employment, school history and/or unemployment over the past 10 years. This information must be over a continuous 10-year period, leaving NO GAPS IN TIME including time spent caring for children, attending school, traveling, etc.

Applicants will be fingerprinted and are subject to an FBI Records Check prior to employment.

INSTRUCTIONS:

| 1 | Begin with your current activities and list in reverse chronological order (go backwards in time) covering 10 years with no gaps. Include employment, unemployment, schooling, and all other activities. |
|---|---|
| 2 | Provide complete names, zip codes, daytime phone numbers, and job titles. |
| 3 | For military service, provide a copy of your DD-214 |
| 4 | For education, you may submit transcripts for school verification |
| 5 | For description of responsibilities, resume with a description of those responsibilities may be included. Put "See Resume" for responsibilities on this form. |

# CONFIDENTIAL

## EMPLOYMENT - GENERAL

| Legal to work in U.S.: | Yes | | Able to Relocate: | Yes |
|---|---|---|---|---|
| Contact present employer: | Yes | | Contact previous Employer: | Yes |
| Ever discharged for misconduct: | No | | | |

Details:

## EMPLOYMENT - PRESENT

| From: | 2/2/2016 | To: | Present | | |
|---|---|---|---|---|---|
| Company: | Republic Airways | Part 121: | Yes | Part 135: | No |
| Address: | 8909 Purdue Rd | | | | |
| City: | Indianapolis | State: | IN | Zip: | 46268 |
| Position: | Pilot | | | | |
| Duties: | Aircraft pilot | | | | |
| A/C Flown: | ERJ 175 | | | | |
| Flight Hours per Month: | 85 | | | | |
| Supervisor: | Ashley Gomez | Phone: | 317-484-6000 | | |
| Reason for Leaving: | | | | | |

## EMPLOYMENT - HISTORY

| From: | 2/1/2012 | To: | 2/1/2016 | | |
|---|---|---|---|---|---|
| Company: | Taylor Technologies | Part 121: | No | Part 135: | No |
| Address: | 31 Loveton circle | | | | |
| City: | Sparks | State: | MD | Zip: | 21152 |
| Position: | Pilot / mechanical fabricator | | | | |
| Duties: | | | | | |
| A/C Flown: | F 90 | | | | |
| Flight Hours per Month: | 15 | | | | |
| Supervisor: | JB Babcock | Phone: | 410-599-2369 | | |
| Reason for Leaving: | Project completed - to return to airlines | | | | |
| From: | 11/17/2003 | To: | 2/1/2012 | | |
| Company: | USA3000 Airlines | Part 121: | Yes | Part 135: | No |

# CONFIDENTIAL

| Address: | 335 Bishop Hollow Road, Newtown Square | | | | | |
|---|---|---|---|---|---|---|
| City: | Newtown Square | State: | PA | | Zip: | 19073 |
| Position: | pilot | | | | | |
| Duties: | pilot A320 aircraft | | | | | |
| A/C Flown: | A320 | | | | | |
| Flight Hours per Month: | 65 | | | | | |
| Supervisor: | Vanakay Hurnivich | | Phone: | (610) 325-1280 | | |
| Reason for Leaving: | company ceased operations | | | | | |
| From: | 2/1/2003 | To: | 11/16/2003 | | | |
| Company: | pearce enterprises | Part 121: | No | Part 135: | No | |
| Address: | pob 576 | | | | | |
| City: | monkton | State: | MD | | Zip: | 21111 |
| Position: | owner | | | | | |
| Duties: | home repair | | | | | |
| A/C Flown: | na | | | | | |
| Flight Hours per Month: | na | | | | | |
| Supervisor: | william pearce | Phone: | 410-472-2399 | | | |
| Reason for Leaving: | return to aviation | | | | | |
| From: | 7/5/1999 | To: | 2/1/2002 | | | |
| Company: | usairways | Part 121: | Yes | Part 135: | No | |
| Address: | 2345 crystal dr. | | | | | |
| City: | arlington | State: | VA | | Zip: | 22227 |
| Position: | pilot | | | | | |
| Duties: | pilot aircraft | | | | | |
| A/C Flown: | b 737 | | | | | |
| Flight Hours per Month: | 70 | | | | | |
| Supervisor: | jim corbusier | Phone: | 703-872-7000 | | | |
| Reason for Leaving: | furloughed after 9-11 | | | | | |
| From: | 9/18/1995 | To: | 7/1/1999 | | | |
| Company: | ccair / dba usairways express | Part 121: | No | Part 135: | Yes | |
| Address: | 5301 terminal rd. | | | | | |
| City: | charlotte | State: | NC | | Zip: | 28208 |

CONFIDENTIAL

| Position: | pilot |
| Duties: | pilot aircraft |
| A/C Flown: | ba-31 / dash-8 |
| Flight Hours per Month: | 95 |
| Supervisor: | ken humphries | Phone: | 704-359-8990 |
| Reason for Leaving: | to take job with usairways |

## UNEMPLOYMENT / FURLOUGH

| From | To | Type | Description |
|------|-----|------|-------------|
| 2/1/2012 | 2/25/2019 | Lay Off | USA 3000 Airlines ceased operations permanently. |
| 2/1/2002 | 2/25/2019 | Furlough | Furloughed from USAIRWAYS post 9 - 11 |

Unemployment Details:

jan-2002 - feb 2003 was not formally employed. I have a history in construction and work odd constuction jobs for this period. in feb 2003 I incorporated and started my own company. 2-2012 - 12-2012 not formally employed in aviation.

## EMPLOYMENT - MISC.

License:

Professional Membership:

Butler Vol. Fire Dept. - joined on my 16th birthday. Rapidly climbed the ranks to attain the position on second lieutenant. Not only was I a firefighter, I also was training officer for several years. I was responsible for all of the in house training for new members.

ALPA

Achievements and Awards:

Maryland Governors Salute to Excellence Commendation. Awarded for performance on western states fire fighting detail.
I was the youngest firefighter to be made a fire line officer in the fire department I am a member.
Department of Homeland Security - Service Commendation - FFDO

Volunteer / Charity Work:

Created and continue to run an annual Red Cross Blood drive. 2019 was our twelfth anniversary. Unfortunately due to COVID we had to cancel the 2020 & 2021 drives.
The Red Cross has recognized me for my very consistent and highly productive blood drive.
Butler Volunteer Fire Department member since 1980. Civil Air Patrol.
Civil Air Patrol
Civil Air Patrol
Civil Air Patrol
I also participate in several annual steeplechase racing events that are fund raising events for local hospitals.

# CONFIDENTIAL

Co chair & founder of an annual "Barn Dance" that benefits the Kauffman Cancer Center , part of the Upper Chesapeake Medical Center.

## MILITARY HISTORY

*No Military Service Recorded*

## PILOT EXPERIENCE - GENERAL

| Chief Pilot: | No | Director of Operations: | No | Director of Safety: | No |
|---|---|---|---|---|---|
| Check Airman: | No | FAA Examiner: | No | FAA Approved Program Examiner: | No |

## PILOT & FE CERTIFICATES AND RATINGS

| Airplane MultiEngine Land (AMEL): | ATP | Cert. Number: | ███████ | Issue Date: | ███████ |
|---|---|---|---|---|---|
| Flight Engineer: | | Cert. Number: | | Issue Date: | |

| | | FE Turbojet: | | FE Turboprop: | | FE Reciprocating: | |
|---|---|---|---|---|---|---|---|
| Airplane SEL: | Yes | Airplane MEL | Yes | Airplane SES: | No | Airplane MES: | No |
| Rotor Helicopter: | No | Rotor Gyroplane: | No | | | | |
| Glider: | No | Balloon: | No | | | | |
| Powered Lift: | No | Rider: | No | | | | |
| Turbojet Type: | Yes | B-737 Type: | Yes | Large Aircraft Type: | Yes | | |
| Instrument Airplane: | Yes | Instrument Helicopter: | No | Instrument Powered Lift: | No | | |

## INSTRUCTOR CERTIFICATES AND RATINGS

| Flight Instructor: | | Issue Date: | |
|---|---|---|---|
| Ground School: | | Issue Date: | |

| Airplane Single Engine: | No | Airplane Multi Engine: | No |
|---|---|---|---|
| Rotor Helicopter: | No | Rotor Gyroplane: | No |
| Glider: | No | | |
| Powered Lift: | No | | |

| Instrument Airplane: | No | Instrument Helicopter: | No | Instrument Powered Lift: | No |
|---|---|---|---|---|---|
| Ground Instructor - Basic: | No | Ground Instructor - Advanced: | No | Ground Instructor - Instrument: | No |

## FAA WRITTEN TESTS

| ATP Date: | Current: | Yes* | FE Turbojet Date: | 12/28/1996 | Current: | No |
|---|---|---|---|---|---|---|

CONFIDENTIAL

| FE Turboprop Date: | | Current: | No | FE Recip Date: | | Current: | No |
|---|---|---|---|---|---|---|---|

* Holds ATP or rATP certificate

## FAA MEDICALS

| Class: | First | Issued: | 10/13/2020 | Restrictions: | must posses glasses for near vision |
|---|---|---|---|---|---|

## MISC CERTIFICATES

| Dispatcher: | | Issued: | | Airframe & Powerplant: | | Issued: | |
|---|---|---|---|---|---|---|---|
| FCC Permit: | Yes | | | | | | |

## FAA ACTIONS

| Had Accident: | No | Had Incident: | No | Been Violated: | No |
|---|---|---|---|---|---|

| Certs/Ratings/Licenses suspended or revoked: | No |
|---|---|
| FAA administration actions taken: | No |
| FAA penalty or fine paid: | No |
| Details: | |

## AIRCRAFT FLOWN

| Make | Power/ Class | Cat | PIC | Instr | SIC | Dual | Other | FE | Total | Typed | Last Flown |
|---|---|---|---|---|---|---|---|---|---|---|---|
| a-320 | Turbine MEL | Transport | 0 | 0 | 4768 | 0 | | | 4768 | Yes | 1/2012 |
| E 175 | Turbine MEL | Transport | 0 | 0 | 2705 | 0 | 0 | 0 | 2754 | Yes | 5/2021 |
| ba-31 | Turbine MEL | Commuter | 1132 | 0 | 1186 | 0 | | | 2318 | Yes | 6/1999 |
| c- 172, 172xp2 | Piston SEL | Normal | 1195 | 0 | 0 | 0 | | | 1195 | No | 7/1993 |
| b 737 | Turbine MEL | Transport | 0 | 0 | 1046 | 0 | | | 1046 | Yes | - |
| j3, j5, pa18, 8gcbc | Piston SEL | Normal | 360 | 0 | 0 | 0 | | | 360 | No | 6/1991 |
| f-90 | Turbine MEL | Normal | 347 | 0 | 0 | 0 | 0 | 0 | 359 | No | 11/2015 |
| d-8 | Turbine MEL | Commuter | 0 | 0 | 335 | 0 | | | 335 | No | 6/1997 |

# CONFIDENTIAL

| pa 23 pa 34 | Piston MEL | Normal | 41 | 0 | 0 | 0 | | | 41 | No | 6/1992 |

## FLIGHT TIME BY CONDITIONS

Flight Conditions:

| Airplane Night | Airplane Actual Instrument | Airplane Sim Instrument | Airplane Cross Country |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

| Rotor Night | Rotor Actual Instrument | Rotor Sim Instrument | Rotor Cross Country |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

Simulator:

| PIC | Instructor | SIC | Dual |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

Instrument Approaches:

| Within 6 Months | Within 12 Months |
|---|---|
| 0 | 0 |

Military Sorties:

| PIC | Instructor | SIC | Dual |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

| Turbine | Multi engine |
|---|---|
| 0 | 0 |

## FLYING TIME SUMMARY

Total by Category and Class:

| Airplane SEL | Airplane SES | Airplane MEL | Airplane MES | Airplane Multi Engine | Helicopter Rotor |
|---|---|---|---|---|---|
| 1555 | 0 | 11621 | 0 | 11621 | 0 |

Total by Type of Time:

| PIC | Instructor | SIC | Dual | Other | Flight Engineer |
|---|---|---|---|---|---|
| 3075 | 0 | 10040 | 0 | 0 | 0 |

Total Summary:

| Airplane PIC* | Airplane Turbine | Turbine Fixed Wing | Airplane Total | Total Time | Last Flown Aircraft |
|---|---|---|---|---|---|
| 3075 | 11580 | 11580 | 13176 | 13176 | E 175, 5/2021 |

* PIC = PIC + Instructor
Rotor time is only included in Aircraft Total time calculation

## ADDENDUM

| Have you ever worked for Frontier Airlines? | No |
|---|---|

# CONFIDENTIAL

| Can you produce all of your original logbooks and endorsements (or, if you utilize electronic logbooks, copies of applicable signoffs)? | Yes |
|---|---|
| If you answered no: will you be able to produce copies of your company/flight school sign-offs, endorsements, and FAA documents detailed in Advisory Circular (AC) 120-6SG, Appendix 9 (including 8060-5, 8060-72 and 8710-1) at the interview? | Yes |

From your first flight hour to present, please disclose any and all check rides, stage checks, line checks, PCs, PTs, AQP or any other training event failed or not satisfactorily completed.

- my primary instrument rating . This was in 1987 I believe. The designated examiner failed ALL of his instrument pilots the first ride. I got the standard ; you incorrectly copied holding instructions.

- my yearly maneuvers validation , June 2018. My sim partner had an incredibly strong Eastern European accent. I just couldn't understand him. This in turn disrupted the flow of maneuvers and we ran out of time. I was paired with another sim partner and completed the validation without any problem.

| Do you have the ability to work in Canada? | Yes |
|---|---|

## TRANSPORTATION SECURITY REGULATION DISCLOSURE

An individual is disqualified if the individual has been convicted, or found not guilty by reason of insanity, of any of the disqualifying crimes listed below during the 10 years before the date of the individual's application for authority to perform covered functions, or while the individual has the authority to perform covered function.

1. Forgery of certificates, false marking of aircraft and other aircraft registration violation.
2. Interference with air navigation.
3. Improper transportation of a hazardous material.
4. Aircraft piracy.
5. Interference with flight crew members or flight attendants.
6. Commission of certain crimes aboard aircraft in flight.
7. Carrying a weapon or explosive aboard aircraft.
8. Conveying false information and threats.
9. Aircraft piracy outside the special aircraft jurisdiction of the United States.
10. Lighting violations involving transporting controlled substances.
11. Unlawful entry into an aircraft or airport area that serves air carriers or foreign carriers contrary to established security requirements.
12. Destruction of an aircraft or aircraft facility.
13. Murder.
14. Assault with intent to murder.
15. Espionage.
16. Sedition.
17. Kidnapping or hostage taking.
18. Treason.
19. Rape or aggravated sexual abuse.
20. Unlawful possession, use, sale, distribution, or manufacture or an explosive or weapon.
21. Extortion.
22. Armed or felony unarmed robbery.
23. Distribution of or intent to distribute a controlled substance.
24. Felony arson.
25. Felony involving a threat.
26. Felony involving: I. Willful destruction of property; II. Importation or manufacture of a controlled substance; III. Burglary; IV. Theft; V. Dishonesty, fraud and misrepresentation; VI. Possession or distribution of stolen property; VII. Aggravated assault. VIII. Bribery; or IX. Illegal possession of a controlled substance punishable by a maximum term of imprisonment of more than 1 year.
27. Violence at international airports.
28. Conspiracy or attempt to commit any of the criminal acts listed above.

| In the past ten (10) years, have you ever been convicted or found not guilty by reason of insanity of any of the above listed crimes? | No |
|---|---|

I understand that I am under continuous obligation to disclose to Frontier Airlines, Inc. and any Airport where I have an active SIDA badge any convictions within 24 hours of any disqualifying criminal offense or having been found not guilty by reason of insanity that occurs while I have unescorted access authority.

CONFIDENTIAL

The information I have provided on this application is true, complete and correct to the best of my knowledge and belief and is provided in good faith. I understand that a knowing and willful false statement on this application can be punished by fine or imprisonment or both. (See section 1001 of Title 18 United States Code)

I understand that I may obtain a copy of my criminal history records sent to Frontier Airlines, Inc. by submitting a written request to Human Resources within 30 days of being advised that my criminal history record disqualifies me from being issued an airport badge. I understand that if I believe that any information is inaccurate, I may directly contact the agency that reported the disqualifying conviction to correct my record.

**Print Full Name**
**Signature**
**Date**

**Privacy Act Notice**

Authority: The authority for collecting this information is 49 U.S.C. 114, "Transportation Security Administration", and 49 U.S.C. 44936, "Employment Investigations and Restrictions".

Purpose: This information is needed to verify your identity and to retrieve your criminal history record to evaluate your suitability for access to airport sterile areas and security identification display areas (SIDA), and aircraft. Your Social Security number will be used as your identification number in this process and to verify your identity. Furnishing this information, including your SSN, is voluntary, however, failure to provide it will prevent the completion of your criminal history records check, without which you may not be granted aircraft, sterile area, or SIDA access.

Routine Uses: Routine uses of this information include disclosure to the U.S. Office of Personnel Management for processing and data verification, to the FBI to retrieve your criminal history record, to the TSA contractors or other agents who assist in the maintenance and operation of the fingerprint system, to airport operators to evaluate sustainability for aircraft, sterile area, or SIDA access, to appropriate governmental agencies for law enforcement or security purposes, or in the interest of National Security, and foreign and international governmental authorities in accordance with law and international agreement.

CONFIDENTIAL

# EXHIBIT C

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3

4   CASE NO.: 22cv02635-LKG

5

6   WILLIAM M. PEARCE,

7          Plaintiff,

8             vs.

9   FRONTIER AIRLINES, INC.,

10          Defendant.

11

12      REMOTE DEPOSITION OF GERARDO ARRELANO

13             June 14, 2023

14          S T I P U L A T I O N S

15          IT IS STIPULATED AND AGREED by and between the

16   parties, through their respective counsel, that the

17   deposition of GERARDO ARRELANO, may be taken remotely

18   before Kathleen Cavazos, Commissioner, at 828 Ralph

19   McGill Boulevard, Northeast, Atlanta, Georgia 30306, on

20   the 14th day of June 2023.

21          IT IS FURTHER STIPULATED AND AGREED that the

22   signature to and the reading of the deposition by the

23   witness is waived, the deposition to have the same force

24   and effect as if full compliance had been had with all

25   laws and rules of Court relating to the taking of

Page 7

1      A.   Correct.

2      Q.   What state are you currently residing in?

3      A.   In Georgia.

4      Q.   And where are you currently employed?

5      A.   Delta Professional Services.

6      Q.   And what is Delta Professional Services?

7      A.   They provide flight instruction for Delta

8  pilots.

9      Q.   And is it affiliated or owned by Delta Airlines?

10     A.   It is.

11     Q.   How long have you been working there?

12     A.   Less than a year.  I started in October.

13     Q.   And were you employed for a period of time with

14  Frontier Airlines?

15     A.   Yes, I was.

16     Q.   And where were you based then?

17     A.   In Denver.

18     Q.   What was your position and responsibilities,

19  just from 30,000 feet?

20     A.   Senior manager of talent acquisition, so

21  responsible for all hiring for Frontier Airlines.

22     Q.   Did that include hiring of flight crews?

23     A.   Yes, sir.

24     Q.   Pilots?

25     A.   Yes.

Page 11

1        Q.   Can you tell us what it is?

2        A.   It's an airline apps application.

3        Q.   And is that the application platform, for lack

4    of a better word, that you used at Frontier at the time

5    in early 2021?

6        A.   Yes.

7        Q.   Do you recognize this particular application?

8        A.   Can you clarify?

9        Q.   Yeah.  Do you remember reviewing an application

10   from Mr. Pearce?

11       A.   Yes.

12       Q.   And is this the one that you reviewed?  And feel

13   free to look through it.  It's 10 pages long.

14       A.   I have it on my phone, so I'm just going to look

15   through it quickly.

16       Q.   Sure.

17       A.   Yes.  This looks familiar.

18       Q.   Okay.  Let me -- I'm going to ask you some

19   questions about it, but let me ask some other ones,

20   first.  Did you conduct a screening interview with

21   Mr. Pearce?

22       A.   Yes.

23       Q.   And what -- Describe for us the process -- I'm

24   sorry?  I heard another noise.  Never mind.

25            Did every applicant get a screening interview?

Page 12

1    Every pilot applicant, I should say.

2        A.   It was a screening of form, not necessarily a

3    screening call.

4            MR. PEARCE:  Clarify that, please.

5        A.   Not a screening interview like a phone call.

6            MR. PEARCE:  What was the purpose of it?

7            MR. PETESCH:  Wait.  Mr. Pearce --

8            MR. PEARCE:  Sorry.  Sorry.

9            MR. PETESCH:  No, no.  You're going to get your

10   chance after I go.  I mean, you're new to this process,

11   so it's not a problem, but I will ask -- I'll ask the

12   question for you at this point.

13       Q.   What was the purpose of the phone screening?

14       A.   The purpose of the phone screening was I was

15   asked to give him a call and speak with him to screen him

16   for the role of first officer.

17       Q.   For the role of first officer?

18       A.   Yes.

19       Q.   Were you aware at the time that Mr. Pearce also

20   knew other members of Frontier operations management?

21       A.   I'm not sure, being new.  I was just asked to

22   give him a call.

23       Q.   Who asked you to give him a call?

24       A.   It was Brad Lambert.

25       Q.   And what role did Brad Lambert fill at the time?

1        A.   VP of flight ops, flight operations.

2        Q.   Did you -- Other than him asking you to give

3    Mr. Pearce a call, did you communicate with Brad Lambert

4    on Mr. Pearce's application on other occasions?

5        A.   Yes, after the call.

6        Q.   Now, I'm going to focus for a moment on the

7    application itself and ask you, looking at the

8    application, what were your impressions at the time that

9    you reviewed it?

10        A.   There was a little bit of concern with the

11    application, and this is prior to speaking with

12    Mr. Pearce.

13        Q.   What were the concerns that you had?

14        A.   The concern was the total flight time recorded

15    and the addendum that was filled out at the bottom of the

16    application.

17        Q.   What was the concern regarding the addendum?

18    And let's see what page that's on.

19        A.   I can't find a page on -- Oh, there we are.  It

20    is page nine of 10.

21        Q.   Page nine of 10?

22        A.   Uh-huh.

23        Q.   What was your concern on that page?

24        A.   Right above the section right here where it says

25    "My primary instrument rating."  This section, the main

Page 14

1   concern was the second entry, the maneuvers validation.

2        Q.   What were the concerns surrounding that?

3        A.   The reference to the issue of the incident that

4   he explains here was more attributed to a language

5   barrier and nothing accounting for his contribution to

6   the situation.

7        Q.   So what was your -- Why were you concerned with

8   that?

9        A.   Ultimately, what we look for if there is a

10  situation that is listed here, we want to see

11  accountability and what did the individual learn from it.

12  Did the individual learn, and what was the take out of

13  that and what was the improvement that he made sure that

14  something like this would never happen again.  So this is

15  what I was looking for in this section, which then

16  prompted the call as well.

17       Q.   In reviewing the application of Mr. Pearce, did

18  you know his age?

19       A.   No.

20       Q.   Do you know his age now?

21       A.   I do not.

22       Q.   You also mentioned the flight hours being a

23  matter of concern to you, can you describe why that was

24  an issue to you?

25       A.   The number of hours were high for, typically,

Page 15

1    the individuals that we would bring in to interview for

2    Frontier.  It was over the --

3         Q.  And why was that?

4         A.  Why was it high or why was it --

5         Q.  No, why was that a matter of concern, the higher

6    number of flight hours?

7         A.  The higher number of hours, when we look at

8    that, we also take a look at whether they were a captain,

9    whether they were first officer.  In the original

10   screening, I didn't see -- not on this page, but I didn't

11   see that he had upgraded to the left seat or to the

12   captain's seat, which then provoked the thought of he had

13   a high number of hours but never upgraded to captain,

14   which also was a little bit of a concern.  Was there a

15   reason?  Obviously, the question comes up, was there a

16   particular reason that he did not upgrade, and it wasn't

17   referenced anywhere on his application.  So it was just a

18   question that came up as to why.

19        Q.  In terms of the high hours, did you have a

20   desired threshold at Frontier for hiring?

21        A.  We did.  I'm trying to think of what the

22   threshold was.  It was between -- From my recollection,

23   between seven to eight thousand hours, was the cap, I

24   think, at that time.

25        Q.  Okay.  So I'm going to shift focus a little bit.

Page 16

1   Well, did you have these concerns prior to your call or

2   your screening call with Mr. Pearce?

3       A.  Yes.

4       Q.  I'm going to shift gears to the screening call

5   itself.  Do you recall an approximate --

6           MS. BOSILOVIC:  Peter, I'm sorry.  Would you

7   like me to stop sharing my screen?

8           MR. PETESCH:  Yeah.  That's fine.  Thank you.

9       Q.  What's your recollection of the discussion that

10  you had in the screening call with Mr. Pearce?

11      A.  It was introduction of each other.  We discussed

12  his background.  I believe he maybe shared some personal

13  side of his journey, and then we dove into the

14  application specifically, but the call was more so

15  questions about Frontier, why Frontier and his goal about

16  joining Frontier Airlines.

17      Q.  And what were your impressions from his

18  responses on that?

19      A.  They were general responses.  Ultimately, what

20  we would look for -- what I was looking for is why he

21  wanted to join Frontier, not why he wanted a pilot role.

22  Ultimately, the intent there is to make sure the

23  individual is going to be a culture fit.  So the

24  responses were very general.  They were not specific to

25  Frontier, and I felt that he didn't have a lot of

1  information about the company, the brand, and, therefore,

2  it was just a general conversation.

3      Q.  Was the issue of flight hours discussed?

4      A.  I believe he had asked about the hours, but

5  initially, we didn't discuss as part of -- from my

6  recollection, I don't recall that came in until after --

7  toward the end of the conversation when he was asking the

8  why.

9      Q.  Was the issue of his age discussed?

10     A.  No, not at all.

11     Q.  Did you tell Mr. Pearce that his age would be a

12  problem with his application?

13     A.  No, sir.

14     Q.  Did his responses in the screening call raise

15  any concerns with you?

16     A.  The responses were most similar to the

17  application.  When he did share the situation that was

18  just up on the screen here just a bit ago, he also didn't

19  take accountability.  And so, ultimately, I was looking

20  to see what his contribution was to that situation.

21  Ultimately, it's important for the pilot of Frontier to

22  ensure that if there was a situation or infraction or an

23  incident, that they learned from it and they grew from

24  it, and I didn't get that sense from him or in his

25  response.

Page 18

1     Q.  Based on the call that you had with Mr. Pearce,

2   I think you mentioned that you had a discussion with

3   Mr. Lambert again after the call.  Did you?

4     A.  I did.

5     Q.  What do you recall from that discussion?

6     A.  I shared with him how the screening went.  I

7   shared with him what Mr. Pearce had shared with me

8   specifically about the incident and the lack of

9   accountability and that his answers were very general in

10   nature, not to Frontier.

11     Q.  What was your recommendation with respect to

12   moving Mr. Pearce along with the recruiting process, with

13   the interviews?

14     A.  I recommended that we hold it at this time and

15   not bring him in.

16     Q.  And why was that?

17     A.  Just, again, it was more so on the lack of

18   accountability, was the primary piece.  The number of

19   high hours, obviously, was another piece and that he

20   hadn't upgraded to captain.  So it was a combination.

21     Q.  Did you recommend not moving him along because

22   of his age?

23     A.  No.

24     Q.  Did his age play any factor in that?

25     A.  No.

Page 19

1      Q.  Did you know his age at the time?

2      A.  No.

3      Q.  I'm going to show you --

4          MR. PETESCH:  And, Alexis, if you could help me

5      out on that, Pearce (sic) Exhibit Number 2 -- well,

6      Arrelano Exhibit Number 2.  Are you able to do a Screen

7      Share with that, Alexis?

8          MS. BOSILOVIC:  Yes.

9          MR. PETESCH:  And, Mr. Pearce, I also emailed a

10     copy of that to you.  You might have had that from the

11     previous EEOC matter.

12         MS. BOSILOVIC:  And can you all see my screen,

13     and is this the exhibit you'd like to use, Peter?

14         MR. PETESCH:  It is.

15     A.  I can see it.

16         MR. PETESCH:  Can everybody see the exhibit?

17     Mr. Pearce, can you see it?

18         MR. PEARCE:  Yes.  Well, all I see is "thank

19     you" on the screen.

20         MR. PETESCH:  Are you able to pull up the one I

21     emailed to you?

22         MR. PEARCE:  I'm just doing that now, yes.

23         MR. PETESCH:  Okay.  That will just make it a

24     little easier.

25         MR. PEARCE:  Let me make sure I've got the right

Page 22

1      A.  No.  Brad is -- He was the decision maker.  I

2  just made recommendations.

3      Q.  In early 2021, late 2020 into 2021, with respect

4  to pilot candidates, did you recommend moving along or

5  hiring other candidates who were over the age of 50?

6      A.  Yes.  Part of our screening is we don't have

7  access to age.  As part of the interview or anything like

8  that, we don't capture any of that information.  It's

9  after the fact that we find out when individuals share,

10  but yes, we would.

11      Q.  So I suppose you would only know after -- Well,

12  would it be true that -- Let me strike that question.

13          At what point would you learn a successful pilot

14  candidate's age?

15      A.  We would -- And, again, none of the information

16  that would come across that we would gather has the age.

17  It was if the individual shared that and that was either

18  during the interview -- I'm sorry, after the interview or

19  when they were looking to see where they would fall

20  within the seniority of the class itself.

21      Q.  If an individual was ultimately hired, would

22  Frontier then find out the individual's age?

23      A.  Frontier would, yes.  I just didn't have access

24  to it.

25      Q.  Do you know if Frontier hired other pilot

Page 23

1    candidates over 50 in that time range?

2         A.   Yes.

3         Q.   Well, were you saying, yes, that you know if

4    they did or yes that they did?  Sorry.  That wasn't clear

5    in that question.

6         A.   Yes, Frontier did.

7         Q.   Do you know if Frontier ever did any analysis of

8    the average age of pilots hired?

9         A.   Yes, they do.

10        Q.   What was that all about?

11        A.   The purpose of that is that as we would screen

12   candidates, we would look and see where our niche was

13   specifically, given the pilot pool is very small and all

14   carriers are competing for the same individual.  It was

15   important for Frontier to identify who our pilot was, and

16   part of that was their background demographic, things of

17   that nature.  So the average age would range between 40,

18   45-ish, around that age.

19        Q.   So in coming up with that average, would that

20   include persons over the average age?

21        A.   Yes.

22        Q.   And, obviously, under the average age?

23        A.   Yes.

24        Q.   In your experience -- I'm shifting gears a

25   little bit to the issue of flight hours -- does an

Page 24

1  individual's flight hours necessarily translate to age?

2      A.  No.

3      Q.  How would you explain that?

4      A.  Well, I don't know if this is specific to

5  Frontier, but Frontier had several flow programs, and so

6  depending on the avenue that the pilot came through --

7  Specifically, there was a Purdue flow program, there was

8  an Embry-Riddle flow program, there was a U&D flow

9  through, there was an ATP flight school flow-through

10  program.  Those flow-through programs are designed to

11  identify top tier candidates, but those individuals were

12  very fairly young.  And so if a pilot came through that

13  avenue, they could potentially, now, in today's world,

14  have a higher number of hours.  So the age and hours

15  isn't a true correlation because the pilot now comes from

16  various avenues, not just one pathway.

17      Q.  Let me see if I have any further questions for

18  you.  That's usually a good sign.  I have no further

19  questions for you.  We can -- Well, it's up to

20  Mr. Pearce.  We can take Exhibit 2 off the screen, but I

21  have no further questions.

22          And now, Mr. Pearce, you can ask your questions.

23          MR. PEARCE:  Awesome.  Very good.

24                        EXAMINATION

25  BY MR. PEARCE:

Page 25

1      Q.  I'm going to bounce around here a little bit.

2  My shorthand isn't very good in writing questions.  So

3  let's start with the meat of the conversation.  You said

4  that we reviewed my background, reviewed my flight hours

5  and -- yeah, the history of my employment, and then we

6  went on to some more general stuff; is that correct?

7      A.  Can you -- I guess I'm confused.  What time

8  frame are you alluding to?  Is it our conversation?

9      Q.  The 14 minutes we spent together over the phone.

10     A.  We didn't go over your employment.  We kind of

11 talked about introductions to each other.  You shared a

12 little bit about your journey, but we didn't go into

13 detail about your employment background, no.

14         MR. PEARCE:  At this time, can we ask the court

15 reporter to read back his response on that, please?  He

16 specifically said that we went over my background, my

17 history and my employment.

18         MR. PETESCH:  I think the record is going to

19 speak for itself on that.  If the court reporter can

20 locate that, that's great.

21         THE COURT REPORTER:  Give me one moment.  It

22 might take a little bit.  Let me look.

23         (Off-the-record discussion.)

24         (Whereupon, a previous question and answer was

25 read back by the court reporter as follows:)

1   in.

2        Q.   No.

3        A.   My response was, We will give you a call if

4   there's an opportunity to bring you in to meet the team.

5        Q.   That was in an email response a week later.  So

6   in the three times that I asked you in different ways why

7   would the pilot review hiring committee not consider

8   people with over seven thousand or seventy-five hundred

9   hours, do you recall telling me, Because they consider

10  you too old, set in your ways and untrainable?

11       A.   I do not recall that.  I do not use "set in

12  their ways" term.  We never discussed age.  I still do

13  not know how old you are and had not ever seen you

14  because this was a phone call.  So I know I wouldn't have

15  said that.  If anything, there is a perception out there

16  that pilots, after a certain number of hours, sometimes

17  it's difficult for them to transition and learn a

18  different type of training, especially Frontier's

19  training which is deemed very difficult at times.  Again,

20  I'm not a pilot, so I can't speak to the training, so.

21       Q.   So it's funny you mention that, that you

22  volunteered that that's a mindset out there, but you

23  don't recall telling me that I'm too old, too set in my

24  ways and considered untrainable.  You don't remember

25  telling me that that's the way the pilot review hiring